Good morning, your honors, and may it please the court. Miranda Fritz for Alpine Securities. Today, we're here because of a very important issue regarding government power being conferred on private citizens and private companies. Who have no obligation to abide by the Constitution. That concept that idea of government power being handed off to private citizens was dealt with by the Supreme Court. Back in 1935, and in Carter Cole and Schechter Poultry, the Supreme Court made clear that we do not give government power to unaccountable private citizens. And it did so for a host of very good reasons, including conflicts of interest, business conflicts, all of that. Now, after that, there was a decision in Atkins that said, but this kind of conferral of government power may be permissible where the private entity is subordinate to the agency. And it did so in the context of a reference to advisory or ministerial roles that might be occupied by private citizens or private entities. And that was really the state of the law until we ended up in the last couple of years with a flurry of cases that involve this kind of delegation of governmental power to a private entity, all arising from the act called HISA and the conferral of power to the horse racing authority. And now, this court is in the midst of that conversation. That conversation has led to a split in the circuits. The Fifth Circuit's decision in National Horsemen's is a very clear and persuasive decision regarding private non-delegation. We also have decisions from the Sixth and from the Eighth Circuit. And we have decisions in the Alpine case from the D.C. Circuit as well, having to do primarily with the Article II issue. Those cases lead to only one conclusion. First, let's look at the rulemaking authority that has been given to the defendants. In horsemen's, in the Oklahoma case, and in the recent Walmsley case. Can I stop you for a minute? Yeah. I didn't see where you, in your motion for preliminary injunction, made any argument about rulemaking. It seemed to be focused entirely on enforcement. It certainly is. And then the district court, of course, focused its decision on enforcement. So why would we take that up now if it wasn't challenged? It is part of our underlying case, but let's focus on enforcement. Well, I'd like an answer to the question of whether you may have waived that argument. I don't believe so. I think the rulemaking issue is in the underlying case that we filed. And I think the rulemaking decisions. How is it in it? By virtue of. I'm asking, did you argue what you argued in your brief on appeal, which was fairly extensive about rulemaking? I saw no argument in your, about rulemaking, only about enforcement on your preliminary injunction motion. We certainly have briefed the fact that there is no provision that enables these defendants to add or modify or abrogate the rules that would be proposed by DTC. And so we presented that in our briefing. You mean on appeal? Yes. I'm talking about, have you preserved this issue below by raising the rulemaking objection below? In the context, certainly it's a part of the complaint. Because the district court didn't seem to understand it. I didn't see it, and the district court only talked about enforcement. It may not have been the focus of the argument. And certainly the enforcement issue, I think, is front and center here. So if we look at the cases, Horstman's, Oklahoma, or Walmsley, with respect to the enforcement issue, again it comes down to, we've got governmental power. We're handing it off to a private entity. We're doing that, arguably, they would argue, in a way that takes governmental power that is intrinsically intertwined with constitutional constraints that are intended to protect the citizens that are the subject of governmental power. And we're stripping those protections away. And so through the device that we're seeing here, Congress gives to the SEC the obligation to deal with the national market system. The SEC outsources it to an entity that supposedly need not comply with the Constitution. If the SEC were actually bringing the action, no question that they would have the obligation to comply with the Constitution. But through this mechanism, we end up with an argument that this significant government authority can be wielded by an entity that is not abiding by the Constitution. So if we look at the factors that are considered in the various cases, for what makes it subordinate? What would cause this to be permissible as a private non-delegation? We look at issues about who is making the decision and where the power and the authority lies. In Horstman's, they took a hard look at the enforcement power that had been delegated and found that those were quintessential executive functions and that the delegation was invalid. Now, if we look at what we've got here, in this case, we have enormous enforcement power being given to these defendants without there being any involvement by the agency. So we have all of the rules that they are promulgating and then enforcing, commencing investigations, conducting investigations, engaging in prosecution, all without any agency involvement. Counsel, can I just stop you there? Because I think your opposing counsel will argue that actually the SEC may stay agency actions, that there's a state power. I'm wondering what you think about that. In Horstman's, they talked about whether a back-end review is sufficient. And they certainly held that it was not. Because in the meantime, there is every reason or likelihood that the entity, like my client, gets destroyed. So let's just bear in mind, the DTC has the power to take action against my client. According to the regulation, it can pursue a sanction in its discretion. And I suggest to you that's a very unusual provision, that they may act in their discretion. They then have three members of the board who supposedly adjudicate whether or not that sanction should be imposed. And there is nothing, the decision becomes effective immediately. So the only hope that an entity has, the only way that an entity can survive their action, is if a discretionary stay is granted. They've used this power in two cases, in the Lett case and in the case against Alpine. And in the Lett case, no administrative stay was granted and the business was destroyed. In this case, what we have is this administrative stay. It's not a stay pending any conclusion of the appeal. It is simply an interim stay until they decide whether we're entitled to a stay. So we are literally, day by day, hanging by a thread. So given that, given the fact that we could be shut down tomorrow. But you haven't been shut down, and isn't this an as-applied challenge? Isn't that what you said? This is as-applied. But again, the irreparable injury, I would argue, is very clear and very real. I'm sorry, can we just stop to clarify that? So you're not making a facial challenge of any kind? This is an as-applied challenge. Okay, you're just, so I have you saying it, you are not making a facial challenge, is that correct? I believe that's correct. I believe you indicated that in your 28J letter, I think. Yeah, I just wanted to confirm that. And that distinguishes this case from the rulings that came down in Walmsley and in Oklahoma, where they looked at hypotheticals to decide if, hypothetically, the agency had the power to subordinate the private entity. So in that case, they really went all the way to hypotheticals in order to say, given that we only have a facial challenge here, we're going to uphold it. In this case, you're seeing the reality. There is no subordination. The process is clear as a bell. This private entity, for its own reasons, pursued this action with no involvement by the agency, no pre-approval, obviously, by the agency, not as a recommendation to the agency. And I can tell you, in these situations ordinarily, there is arguably a level of subordination because a private entity's decision would not become final until it was reviewed. That's the FINRA model, by the way. It does not become final. Here, the decision is final as soon as those board members issued it. They are allowed DTC and these defendants to act in their complete discretion as they take this action. This action is clear exercise of governmental power. It does deprive us of access to the markets. The SEC has made clear it is an irreparable injury. And so, for all of those reasons, if you look at all of the decisions that are swirling around right now, this enforcement structure is not valid. And I would like to reserve two minutes and 20 seconds. Thank you, counsel. Excuse me. May it please the court. My name is Mark Harris and I represent the National Securities Clearing Corporation, the Depository Trust Company, and the Depository Trust and Clearing Corporation. I'll be spending my time with counsel for the government. Since the very beginning, the securities industry in this country has regulated itself, including setting and enforcing the standards for membership. Clearing agencies in this country have always been private entities. Alpine now argues that NSCC and the others should be treated for constitutional purposes as if they are part of the federal government. Or, if not, that they have been unconstitutionally delegated federal power. That position goes against very long established precedent, both from this court and from the Supreme Court. Counsel, can I just stop you there? So, you started with saying that this has historically been done. I'm wondering what weight you think that that should be given. The fact that... That we've always done it this way. Well, the fact that these are private entities and it's always been done this way is important for the... For example, you didn't hear it just now, but in their brief, Alpine argues at great length about state action. Alpine argues that there's state action involved here because there's some kind of discharge of federal power. That's clearly not the case, or at least one ground for that can't be right, because this has never been something that's been done by the government. Clearing and settling securities trades were never done by the government. They were always done privately. So, it's one of many factors that goes into, I think, the court's consideration of whether it wants to upend this scheme. I'll also mention that one of the things that counsel for Alpine was dwelling on was comparison to these horse racing cases. Every one of those cases goes out of its way to talk about how the SEC SRO model really is the standard for correct delegation, for a constitutional delegation, and also for a constitutional discharge of powers. Nothing about those cases changes anything concerning, and none of them even purported to attack the model which each of those circuits upholds, that the relationship between the SEC and SRO that it regulates is constitutional. Of course, that is dicta in those cases. Absolutely. It is dicta. This question was not specifically for any of them. No, that's true. But it is significant only insofar as even the Fifth Circuit, which I think is the main case that counsel for Alpine wants to rely on, even the Fifth Circuit was explaining why that model for the horse racing cases it thought didn't measure up to the securities SEC model. It's simply, that's the bellwether, and that's the model we have here. You're not suggesting in response to Judge Ide's question, I don't know if you answered it as to the non-delegation doctrine. It doesn't really matter that this is the way it's always been done, does it? I see your point, perhaps, on the first. No, I'm not arguing that history settles the matter, but the history is significant, I think. I mean, the Supreme Court, not simply this Court, but the Supreme Court also has deferred to that. There are really two arguments that Alpine makes concerning, I should mention first, I guess, that this Court, as Judge Moritz, you're aware because you were on the panel, already decided once that Alpine could not meet the standard for some kind of injunctive relief from this Court. As the Court pointed out in that decision, it's exactly the same standard now. Nothing has changed. The legal framework is the same. The facts are all the same, and they're not entitled to it now either. There are two arguments on the merits that they push for why they think there was something unconstitutional here. The first one, which you didn't hear about today, has to do with the Appointments Clause. I'll mention that very quickly because I think, perhaps we can infer from counsel's presentation here, they're not relying on it very heavily anymore. But their argument they made in the briefs was that there was a violation of the Appointments Clause because NSCC and its sister companies are all parts of the federal government under the LeBron standard. It's a complete non-starter of an argument. LeBron is the standard. They can't satisfy any of the LeBron standards, any of the three prongs for LeBron. They make a sort of half-hearted argument that, well, maybe state action should be the test, or maybe something under Buckley or Lucia should be the test. None of those arguments work. The Supreme Court has consistently applied LeBron here. It's clearly not either one of those other two tests. I won't go on about that point unless the court wants to hear a further argument on that. I'll really address the main thing that you heard from Counsel for Alpine, which had to do with non-delegation. Could you address my question about the rulemaking versus enforcement and what the focus of the proceedings were below and whether anyone was even talking about rulemaking? So we pointed out, Your Honor, in our brief, and I had the page a minute ago, that this was a new position that they pivoted to on appeal, which was that I don't have the page now in front of me, but that they began to argue before this court for the first time that basically relying on the Fifth Circuit's theory that there was some difference between the powers that were given to the SEC to regulate other SROs versus clearing agencies. I'm not sure if that's what Your Honor is referring to. That argument was not made below, and I think that's really the essence of their whole argument. Their whole argument is that there's something fundamentally different about the way clearing agencies are regulated by the SEC from other securities SROs, and it's not true. We point out the slight statutory difference, which is probably a relic just of a historical matter, when these statutes were passed between the way the SEC can control other securities SROs versus clearing agencies. It's pretty clear from the rules that although this one rule that's mentioned, which for other SROs allows the SEC to directly rewrite their rules, that doesn't exist for clearing agencies, but there's an equivalent and probably even much broader power that the SEC has, which is to directly issue rules and regulations that it can order the clearing agencies to follow. That's in Section 78Q1d1. And we even gave examples in our brief on page 37 of situations where the SEC had exactly done that. The SEC had actually issued regulations saying, this is what you need to do to your rules, clearing agencies, in order to comply with minimum standards that we think are appropriate. Well, that's distinct, though, from having the power, isn't it, to modify or abrogate the rules, the clearing agency's rules? It's effectively the same thing, Your Honor. How? I'm not understanding that. What happens is, through one method, what takes place is that the SEC rewrites the rules itself for other SROs. For clearing agencies, what it does is it says to them, you have to rewrite them, or these will be your rules, or you must comply with these regulations. And that prompts anything that the clearing agencies have for themselves. For example, I mentioned earlier that there were several examples of this that we cite in our brief. One of those examples is where the agency—excuse me one second. In one of those examples, these were—this is 77 Fed Reg 66220. It requires clearing agencies to, quote, establish written policies and procedures reasonably designed to meet certain minimum requirements, and then it spells out what they are. So it's essentially telling a clearing agency, this is what you have to do. It's done—it's effectively the same thing. The point, I think—and maybe I could just finish with this point and then turn over the podium to my co-counsel. What you heard from Counsel for Alpine is that there is no effective control by the SEC over enforcement. That is absolutely not true. There are at least three significant things that the SEC does that make it fundamentally different from that Horstman's case. The first one is that the SEC has every power of enforcement that the agency—that the NSEC has and more. NSEC cannot issue subpoenas. NSEC does not—cannot begin civil enforcement suits. The SEC can do those things, including enforce the clearing agency's own rules. That's number one. Number two is in 15 U.S.C. 78Q-1B3 Cap A, it says that the SEC can control the method of enforcement. The SEC actually has the power to tell or to require that enforcement happen in a certain manner. And the third thing is that the SEC has the power to decertify or suspend or revoke the clearing agency's charter. That is—that is control. That's as much control as an agency could possibly have over—a governmental entity could possibly have over a clearing agency. Every single thing a clearing agency does has to meet one of those—one of those requirements. That is—there's really nothing that's lacking there. And unless the Court has further questions, let me turn it to Governor Powell. Mr. Harris, I have to ask this of you rather than the intervener, and I realize you're imposing on our time. But the notice of intent to cease to act was issued on November 9. When was there a cessation of acting? When did that occur? There has been no cessation even as of now, Your Honor. There's still processing. Exactly. There was a hearing in March of 2024. In April of 2024, when the hearing—when the DTC's panel issued its decision, the very next day we told counsel for Alpine that we would not actually enforce the CTA any sooner than 30 days from that date to give them time to go to the SEC. And then they did go to the SEC. The SEC granted the administer the stay. Was that an exercise of discretion or an application of rules? That was an exercise of discretion. But I think what you heard today was that this was—this is an as-applied challenge. I don't know how they can challenge—I don't know how they can say that, you know, they're waiting by the day or that the power to have cut them off could have been exercised against them when it wasn't. That's their challenge. Their challenge—nothing happened for them. But it could have. You said that was a discretionary decision, not one mandated by rules. It was, but they're challenging right now whether there's any irreparable injury. You mean because it's as-applied? Because it's as-applied, yes. Thank you, Your Honors. May it please the Court, Mark Stern for the intervener, the United States. There's been a lot of discussion, and I'm mostly interested in trying to answer any questions that the Court may have about any aspect of the case. There are two primary concerns that have been discussed. One is the how do we determine whether this is governmental, and the other one is, assuming that it's not governmental, is there sufficient oversight under sunshine and anthracite in all the subsequent cases to make it a proper delegation and not an impermissible delegation of power on the governmental side? We've got the LeBron test, which, notwithstanding some statements in my friend's brief, is, everyone recognizes, continues to be the standard, and among other factors that are key is did the government create the corporation and does it retain an ongoing ability to appoint its members? The answer being clearly no, and when the Supreme Court in free enterprise addressed the accounting board in that case, it went out of its way to explain, and all the parties agreed that this was the government, but the reason that it was, the Court says, look, this is modeled on the self-regulatory agencies, but unlike the self-regulatory agencies, this one meets the LeBron factors. We had the appointments, and it was created by the government for a governmental purpose. I'd like to, since there was a lot of discussion about the Fifth Circuit's second opinion in National Horsemen's, I would just like to draw the Court's attention in particular to 107F4 at 439, where the Court essentially goes through most of the arguments that are being made here and one by one rejects them, including the, it applies the LeBron factors, it rejects arguments that it was, that the LeBron was only concerned with cases that weren't involved with helping the government, it rejects the officer argument. The difference between the Fifth Circuit decision and the two other decisions is about an issue that is in no way present in this case. Then the, since it is not the government, then the issue becomes, is there a proper delegation, proper oversight? And that's what the Supreme Court, like, looks at in the National Railway Association case. It says, look, if it's the government, then I've got to be concerned about the appointment power. But if it's not the government, then I don't have to be concerned about it. Then I have to be concerned about the delegation standards. And I'm happy to talk about the rulemaking power, which I think is extremely extensive. And the, when you look at, like, some of the rules that- Your time is up. Oh. I'm sorry. Let me close it up. I was just going to say that both at the enforcement and, like, the only difference that there, the enforcement analog in the Fifth Circuit case, the only part of that enforcement that disturbed the court has no analog here. Thank you. Thank you very much.  Thank you for the rebuttal. Thank you. I want to briefly start with Article 2, because I really did not discuss it. They're correct. On the Article 2 analysis, I believe that Justice Walker's opinion in the D.C. Circuit takes a hard look at whether using LeBron as the only test makes sense. Because as Judge Walker explains, it creates a constitutional loophole that says you can solve the problem as long as you call it private. He references Lucia, for example, and says, does that mean the solution with respect to ALJs is to simply put them into something that's called private? He has a very well-reasoned opinion. And so I would refer to that on the Article 2 issue. But I agree with counsel that the intersection between these two concepts is critical. At the end of Walmsley, in the dissent, the judge talks about the fact that if we are going to allow the evasion of Article 2, then the private delegation doctrine has to have particular force so that we're not giving governmental power to these kinds of private citizens. Counsel, before you move on, can I get you to respond to your opposing counsel's, I guess, implication that you can't really do an as-applied challenge here because nothing has happened yet? The fact is we have been subjected to a proceeding that I think, if you take a look at it, was shocking in the way that it was conducted. The decision was reached. We were thrown out of the organization. And the only thing that happened since then is an administrative stay came down from the SEC. And so it might be tomorrow or it might be next week. But the issue here is we are facing this kind of irreparable harm. And we, yes, we were able, we were fortunate that we were not shut down immediately. But we had to take that step in order to try to keep the business open. So we do think that this issue is very much before the court in terms of whether these enforcement powers that they have been given are valid or invalid. I wanted to go back. Counsel, your time is up. You need to sum it up. Okay. One point that was made by counsel was private. Counsel, you're on the red. That means you're past your time. Okay. Sorry. Thank you. You can sum it up in a line. I just didn't want you to start a new argument. Okay. In our reply brief, we cite the congressional language that accompanied the passage of the authorization for this kind of clearing agency. Congress said these SROs will exercise government power, period. Thank you. Thanks to both counsel for your arguments. They've been very helpful. Counsel will be excused. Case is submitted.